UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                    :
UNITED STATES                                       :
                                                    :              13 Cr. 699 (PAE)
                          -v-                       :
                                                    :              OPINION & ORDER
KELVIN MARTINEZ,                                    :
                                                    :
                                    Defendant.      :
                                                    :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

On a tip from an alleged co-conspirator, agents of the Drug Enforcement Agency

("DEA") arrested defendant Kelvin Martinez on May 15, 2013, at the site of a previously

arranged drug transaction.  Following his arrest, the DEA searched Martinez's car and found,

among other things, a kilogram of cocaine.  Martinez also made several statements to agents

regarding his involvement in narcotics trafficking.  Martinez was later indicted and charged with

distribution and possession with intent to distribute 500 grams and more of cocaine, in violation

of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

Martinez now moves to suppress both the physical evidence seized from his vehicle and

the statements made to the agents following his arrest.  As to the physical evidence, Martinez

claims that it was seized in violation of the Fourth Amendment.  Specifically, Martinez argues

that the tip to the DEA was not sufficiently reliable to support a finding of probable cause for his

arrest, and that the ensuing search of his vehicle that yielded the physical evidence was therefore

unlawful.  As to the post-arrest statements, Martinez claims that the agents failed to adequately

advise him of his *Miranda* rights.

On January 8, 2014, the Court held a suppression hearing on the motion to suppress Martinez's post-arrest statements, and heard argument on that motion and the motion to suppress the physical evidence seized from Martinez's car.  For the following reasons, Martinez's motions to suppress the drugs seized from his car following his arrest and to suppress his post-arrest statements are denied.

## I.      Background

On May 15, 2013, DEA agents arrested an individual, hereinafter referred to as CC-1, on suspicion of narcotics trafficking.  Following his arrest, CC-1 informed the agents that he had previously arranged to pick up one kilogram of cocaine later that evening from an individual known to him as "Kelvin Chapli," whom CC-1 identified as Martinez, and that Martinez would be driving a white Range Rover when they met.  The agents then monitored two telephone calls between CC-1 and Martinez, in which the two discussed the logistics of their upcoming meeting. In the first call, Martinez confirmed the plan to meet CC-1 shortly thereafter, on 199th Street and the Grand Concourse in the Bronx.  In the second call, Martinez confirmed that he was almost at the meeting point, and that he would be driving a white vehicle.

After the agents observed Martinez arrive at the appointed location at the appointed time, driving the car described by CC-1, they arrested him.  The agents then transported Martinez and his car to a nearby area, at the intersection of 205th Street & Paul Avenue in the Bronx.  At that location, several agents questioned Martinez regarding the kilogram of cocaine they believed to be in his car.  Martinez told the agents that he had been on his way to deliver pills to a buyer with whom he had just had a phone conversation.  He also told them that the car he had been driving was registered to his father.  At the same location, the agents also searched the car.  That search yielded a kilogram of cocaine, as well as a quantity of pills.

On May 16, 2013, Special Agent Moises Walters of the DEA swore out a Complaint attesting to the basis for Martinez's arrest, and Magistrate Judge Frank Maas found there to be probable cause to arrest Martinez, based on the Complaint.[1]  *See* Dkt. 1, 16, Ex. 1 ("Complaint"). Martinez was released from custody, on conditions of bail.[2]

On September 11, 2013, a grand jury returned a one-count indictment against Martinez, charging him with distribution and possession with intent to distribute 500 grams and more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

On November 27, 2013, Martinez moved to suppress the physical evidence and the post-arrest statements.  Dkt. 12.  In support, he filed an affidavit, Dkt. 13 ("Martinez Aff."), and a memorandum of law, Dkt. 14 ("Def. Br.").   On December 18, 2013, the government filed a memorandum in opposition.  Dkt. 16 ("Govt. Br.").  On December 23, 2013, the Court issued an order informing the parties that it would hold a suppression hearing on January 8, 2014 with respect to the motion to suppress Martinez's post-arrest statements only; the Court explained that it would resolve the motion to suppress the physical evidence on the papers.  Dkt. 17.  On December 26, 2013, Martinez filed a reply.  Dkt. 18 ("Def. Reply Br.").

## II.      Need for an Evidentiary Hearing

A defendant is not entitled to an evidentiary hearing in connection with a motion to suppress unless he can show that there are "contested issues of fact going to the validity of the

---

[1] The Complaint, upon which Magistrate Judge Maas based his probable cause finding, included the fact that the post-arrest search of Martinez's car had yielded, among other things, a kilogram of cocaine.  *See* Complaint ¶¶ 10(d), 14.  Although Magistrate Judge Maas properly considered this information in determining whether there was probable cause supporting the charges against Martinez, it is not properly considered in determining whether there was probable cause at the moment of Martinez's arrest, which preceded (and was justification for) the search of his car. Accordingly, the Court will not consider that fact in connection with the motion now before it.

[2] The events of May 15, 2013, set out above, are drawn in large part from the Complaint.

search." *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992). The defendant's moving papers must be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *Id.* "A defendant seeking a hearing on a suppression motion bears the burden of showing the existence of disputed issues of material fact." *United States v. Washington*, No. 12 Crim. 146 (JPO), 2012 WL 5438909, at *8 (S.D.N.Y. Nov. 7, 2012). "In order to make the requisite showing in sufficient detail, the defendant must submit an affidavit by someone with personal knowledge that disputed facts exist." *United States v. Noble*, No. 07 Crim. 284 (RJS), 2008 WL 140966, at *1 (S.D.N.Y. Jan. 11, 2008). "In the absence of such an affidavit, or when the allegations contained in such an affidavit are general and conclusory, an evidentiary hearing is unnecessary." *United States v. Dewar*, 489 F. Supp. 2d 351, 359 (S.D.N.Y. 2007); *see also United States v. Barrios*, 210 F.3d 355 (2d Cir. 2000) (no evidentiary hearing required on motion to suppress in the absence of "an affidavit of someone alleging personal knowledge of the relevant facts"); *United States v. Del Rosario*, No. 12 Crim. 81 (KBF), 2012 WL 1710923, at *2 (S.D.N.Y. May 11, 2012) ("[C]ourts have repeatedly stated that defendants must present a sworn affidavit from a person with knowledge of the underlying facts—and that in the absence of such an affidavit an[] evidentiary hearing is unnecessary.") (collecting cases).

### A.    Physical Evidence

With respect to the motion to suppress the physical evidence, Martinez's submissions fail to establish an issue of material fact. Regarding his arrest and the subsequent search of his car, Martinez's affidavit is silent; that document relates solely to his post-arrest statements. Martinez has supplied nothing more than the single-sentence statement in his attorney's brief that "[a] hearing may reveal the totality of what the agents knew." Def. Br. 3. But "[s]tatements

submitted by an attorney in motion papers before a district court 'cannot by themselves create a
factual issue.'"  *Washington*, 2012 WL 5438909, at *9 (quoting *U.S. v. Mottley*, 130 F. App'x
508, 509–10 (2d Cir. 2005)).  And Martinez's counsel's conclusory statement does not contradict
the facts recited in the Complaint.  Indeed, Martinez and the government appear to be in
agreement as to the facts; they instead disagree whether those facts supplied probable cause for
an arrest.  Thus, there is no basis for an evidentiary hearing.  *See Washington*, 2012 WL
5438909, at *9 (denying evidentiary hearing on motion to suppress evidence seized following
arrest, although defendant contested the existence of probable cause, because "Defendant and the
Government [did not] offer divergent accounts that can only be resolved through credibility
assessments and other evidentiary determinations"); *United States v. Tavarez*, 518 F. Supp. 2d
600, 607 (S.D.N.Y. 2007) (evidentiary hearing not warranted because defendant's declaration
did not establish a disputed issue of material fact; "[n]othing submitted by [the defendant]
contradicts the assertions in the Complaint concerning the [informant's] discussions with
[defendants], or the observations made by law enforcement officers").

In so holding, the Court does not suggest that a factual hearing may never be warranted
except where a defendant can challenge, on the basis of the attestation of a percipient witness,
the asserted basis for probable cause.  In limited circumstances, such a hearing may be merited
where the decisive facts are known only to the Government.  For example, where the existence
of probable cause to arrest a defendant turned on an uncorroborated tip from an informant whom
an agent subjectively attests has historically proven reliable, there may be a basis to permit the
defense to test, at an evidentiary hearing, the agent's claim of such historical reliability, even
though the defense may lack a percipient witness into the reliability of the informant's prior tips.
*See, e.g.*, *United States v. Shamsideen*, No. 03 Crim. 1313 (SCR), 2004 WL 1179305, at *9–*10

(S.D.N.Y. Mar. 31, 2004) (evidentiary hearing warranted in the absence of concrete factual dispute where the government had provided only vague and conclusory statements regarding the reliability of its confidential informants); *accord Washington*, 2012 WL 5438909, at *9.

Such, however, is not the case here.  Martinez does not argue that the agents relied on CC-1's past reliability in assessing probable cause.  *See* Def. Br. 3 ("The information did not come from someone who had established himself as reliable in the past."); Def. Reply Br. 2 (agents relied on "source . . . without any history of providing reliable information in the past"). Nor could he:  Agent Walters' Complaint did not claim any historical relationship or familiarity with CC-1, or that his reliability had been established by prior events.  Instead, the Complaint asserts that probable cause existed based on the concrete steps the agents took to corroborate the information provided by CC-1 to the effect that a drug transaction was imminent.  *See* Complaint ¶¶ 7−10.  Martinez offers no basis for contradicting either that CC-1 claimed to the agents that a drug transaction was imminent, or the facts that Agent Walters set out as corroborating that claim (CC-1's two consensually monitored calls with Martinez, and Martinez's appearance in the white vehicle at the time and place agreed upon with CC-1).

In sum, Martinez fails to put *any* fact relating to the circumstances of his arrest, let alone a material fact, in dispute.  Accordingly, Martinez's request for a hearing on his motion to suppress the physical evidence seized from his car is denied.

### B.    Post-Arrest Statements

Regarding his post-arrest statements, by contrast, Martinez's affidavit does raise disputed issues of material fact requiring an evidentiary hearing, namely whether the agents read Martinez his rights, and whether Martinez communicated to the agents that he understood his rights.  *See* Martinez Aff. ¶¶ 5−7.  The government concedes that an evidentiary hearing is warranted.  Gov.

Br. 9.  Accordingly, Martinez was entitled to a suppression hearing on that motion.  *See Noble*, 2008 WL 140966, at *1 (granting request for an evidentiary hearing on motion to suppress post-arrest statements where the "affidavit submitted by the defendant in support of his motions . . . raise[d] a disputed issue of fact with regard to the statements he is moving to suppress—namely, that he was questioned without being properly advised of his rights, and without signing a waiver form").

### III.    Motion to Suppress the Physical Evidence

Martinez moves to suppress the evidence seized from his car on the ground that there was not probable cause for his arrest on May 15, 2013, and thus there was no legal justification for the search of his vehicle.  If the government can establish, by a preponderance of the evidence, that there was probable cause for Martinez's arrest, the search of Martinez's car that followed—and yielded the drugs Martinez now seeks to suppress—is undoubtedly justified under several of the recognized exceptions to the warrant requirement: as a search incident to arrest, *Arizona v. Gant*, 556 U.S. 332 (2009); or under the automobile exception, *United States v. Howard*, 3489 F.3d 484, 292−93 (2d Cir. 2007).[3]  Martinez's motion to suppress, therefore, turns entirely on whether there was probable cause for arrest.

"Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested."  *United States v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004).  The

---

[3] The Government also contends that the search of Martinez's car was justified under the inventory search exception to the warrant requirement.  *See* Gov. Br. 2.  Because the Court finds that, assuming the existence of probable cause for arrest, the search of Martinez's car was justified under either the search incident to arrest exception or the automobile exception, the Court does not have occasion to address this argument.

Supreme Court and the Second Circuit have emphasized that the probable cause analysis is a commonsense, non-technical inquiry, based on the totality of the circumstances rather than on the satisfaction of discrete criteria. *See, e.g.*, *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008); *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008).

Probable cause may be based upon information from an informant so long as the tip bears sufficient "indicia of reliability." *Gates*, 462 U.S. 233; *see Caldarola v. Calabrese*, 298 F.3d 156, 162–63 (2d Cir. 2002); *Gagnon*, 373 F.3d at 235.   Whether an informant's tip establishes probable cause is assessed under the totality of the circumstances approach set forth by the Supreme Court in *Illinois v. Gates*, under which the informant's "veracity," "reliability," and "basis of knowledge," as well as "the extent to which an informant's statements—even about a suspect's innocent activities—are independently corroborated" are all relevant factors.   462 U.S. at 230, 241–44; *see United States v. Pughe*, 441 F. App'x 776, 777 (2d Cir. 2011); *United States v. Elmore*, 482 F.2d 172, 179 (2d Cir. 2007).

In determining the overall reliability of a tip under *Gates*, "a deficiency in one [factor] may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." *Caldarola*, 298 F.3d at 162–63.   "When the informant's tip, standing alone, lacks sufficient indicia of reliability because it does not do enough to establish the informant's basis of knowledge and veracity, it may still support a finding of [probable cause] if sufficiently corroborated through independent police investigation." *United States v. Elmore*, 482 F.2d 172, 179 (2d Cir. 2007).   In other words, if law enforcement independently corroborates some of the information provided by an informant, it may be inferred that the remaining, unverified

information provided by the informant is also true. *See United States v. Canfield*, 212 F.3d 713, 719 (2d Cir. 2000).

Here, the DEA received a tip that Martinez was about to engage in imminent criminal conduct from his admitted co-participant in the crime, CC-1. The DEA then took steps to corroborate the tip: The DEA monitored two phone calls between Martinez and CC-1, one in which Martinez confirmed the time and place of the meeting, and another in which he confirmed that he would be driving a white vehicle. The DEA then observed Martinez arrive at the appointed time and place, driving a vehicle matching that description. The information provided by CC-1, the phone calls listened to by the agents, and the agents' observations, taken together, provided more than sufficient basis for probable cause to believe that Martinez was engaged in narcotics trafficking. *See, e.g.*, *United States v. Gonzalez*, 835 F.2d 449, 450−51 (2d Cir. 1987) (probable cause existed where information provided by informant matched physical description of defendant and timing and location of suspected drug transaction); *United States v. Vanhoesen*, 552 F. Supp. 2d 335, 339 (N.D.N.Y. 2008) ("Taken together, the information provided to the police by the informant, coupled with the phone calls between the informant and Defendant that the police listened to and recorded, and the arrival of Defendant at the place described, at the expected time and in the car described, provided probable cause to believe that a crime was about to be committed or that evidence of a crime would be found.").

Martinez nevertheless argues that the tip provided by CC-1 about the forthcoming drug transaction with Martinez was unreliable, and thus cannot support a finding of probable cause, for two primary reasons: (1) CC-1 had just been arrested for narcotics trafficking, and therefore was not a reliable source; and (2) the details of CC-1's tip were not sufficiently corroborated to

demonstrate that Martinez was engaged or about to engage in criminal activity.  These arguments are unpersuasive.

First, Martinez argues that CC-1 was not credible because "he had a motive to distort the facts to extricate himself from his own problems."  Def. Br. 4.  But the general proposition that an arrested defendant may have an incentive to minimize his criminal exposure gains no traction in the context of CC-1's claim to the agents, upon arrest, that a drug transaction was in progress. With that statement, CC-1 not only implicated Martinez in drug trafficking; CC-1 also implicated himself.  Indeed, CC-1 had originally been arrested on charges relating to a heroin-distribution conspiracy, *see* Gov. Br. 7 n.2; CC-1's statement about a cocaine deal with Martinez therefore implicated CC-1 in trafficking in an entirely different drug, potentially exposing CC-1 to even greater criminal liability.

While in DEA custody, moreover, CC-1 had a compelling interest *not* to invent a story about a rendezvous with Martinez at which drugs would change hands.  Such a false story stood to be proven fallacious, potentially immediately so upon Martinez's arrival, if no narcotics had been found in Martinez's car and if Martinez credibly denied CC-1's claim of a drug conspiracy. In that circumstance, CC-1's lies to the DEA would have deepened his criminal exposure and compromised his bid for leniency.  Lying to the DEA, therefore, was directly contrary to his penal interest; this lends CC-1's inculpatory statement an important hallmark of credibility.  The agents were justified, therefore, in crediting CC-1's account of his pending drug deal with Martinez as potentially truthful, and treating it, once corroborated by CC-1's phone call with the agents and Martinez's appearance on the scene, as a basis for concluding that there was probable cause to arrest.  *See United States v. Harris*, 403 U.S. 573, 583−84 (1971) ("People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own

admissions.  Admissions of crime, like admissions against proprietary interest, carry their own indicia of credibility—sufficient at least to support a finding of probable cause . . . . That the informant may be . . . promised a 'break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct.").

Martinez also argues that information provided by CC-1 was not credible because CC-1, being newly arrested, did not have a track record of reliability.  Def. Br. 3.  However, the Second Circuit has instructed that "[i]n assessing the veracity of an informant's statements, 'it is improper to discount' the information provided 'simply because [the informant] has no proven record of truthfulness or accuracy.'"  *Gagnon*, 373 F.3d at 236 (quoting *Canfield*, 212 F.3d at 719) (alteration in *Gagnon*).  "There is, in particular, 'no need to show past reliability when the informant . . . is in fact a participant in the very crime at issue.'"  *Id.* (quoting *United States v. Jackson*, 560 F.2d 112, 121 (2d Cir. 1977)) (alteration in *Gagnon*); *see also United States v. Dunloy*, 584 F.2d 6, 10 (2d Cir. 1978) (because "informant [was] an admitted participant in the very crime at issue, the Government was not required to show past reliability[; h]is participation as an accomplice satisfied the reliability standard" (internal quotation marks and citations omitted)).

As already noted, CC-1 was a confessed participant in the same narcotics conspiracy in which he implicated Martinez; this fact, standing alone, "ordinarily would suggest reliability," *Gagnon*, 373 F.3d at 237.  Moreover, CC-1's reliability was reinforced in several ways.  First, he delivered the tip to DEA agents in person.  *See id.* at 236 ("[A] 'face-to-face informant must . . . be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false.'") (quoting *United States v. Salazar*, 945 F.2d 47, 50−51 (2d Cir. 1991)) (alteration in *Gagnon*); *see also Canfield*, 212 F.3d

at 719.  Second, the information provided by CC-1 as to an upcoming nighttime rendezvous with Martinez was corroborated by the agents in "material respects," *Gagnon*, 373 F.3d at 238, and his claim was not in any way undercut by the agents' attempts to corroborate it.  This permitted the agents to credit his entire account, "including parts without corroboration," *Canfield*, 212 F.3d at 720 (internal quotation marks omitted).

Martinez nonetheless contends that the steps taken by the agents were insufficient to corroborate CC-1's tip, because the recorded phone calls did not contain a direct reference to drugs or include other statements that conclusively demonstrated that the two men were engaged in narcotics trafficking.  Def. Reply Br. 2.  But to establish probable cause, "it is not necessary to make a prima facie showing of criminal activity or to demonstrate that it is more probable than not that a crime has been or is being committed."  *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir. 1987) (internal quotation marks omitted).  "[O]nly the probability . . . of criminal activity" is required to show probable cause.  *Gates*, 462 U.S. at 235.  And the fact that the calls between CC-1 and Martinez were confined to confirming logistical arrangements, and did not contain overt references to narcotics, is unsurprising.  Individuals engaged in drug trafficking, to avoid detection, often avoid referring to their illicit activities.  That Martinez did not refer to drugs in his brief calls with CC-1 is not out of the ordinary, let alone fatal to a finding of probable cause. *See, e.g.*, *United States v. Steppello*, 664 F.3d 359, 364 & n.6 (2d Cir. 2011) (collecting cases).

Moreover, as the Supreme Court stated in *Gates*, "innocent behavior frequently will provide the basis for a showing of probable cause."  462 U.S. at 243 n.13.  The classic example of independent police confirmation of innocent details is found in *Draper v. United States*, 358 U.S. 307 (1959).  *See Elmore*, 482 F.2d at 179.  There, "an informant . . . reported that Draper would arrive in Denver on a train from Chicago on one of two days, and that he would be

carrying a quantity of heroin.  The informant also supplied a fairly detailed physical description of Draper, and predicted that he would be wearing a light colored raincoat, brown slacks and black shoes, and would be walking 'real fast.' . . . On one of the stated dates police officers observed a man matching this description exit a train arriving from Chicago; his attire and luggage matched [the informant's] report and he was walking rapidly." *Gates*, 462 U.S. at 242−43 (citing *Draper*, 358 U.S. at 309).  The Supreme Court explained that, when the law enforcement officer observed Draper arrive at the train station, at the time anticipated by the informant, dressed in the manner described by the informant, he "had personally verified every facet of the information given him by [the informant] except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag." *Draper*, 358 U.S. at 313.  "[W]ith every other bit of [the tip] being thus personally verified," the Court explained, "[the officer] had 'reasonable grounds' to believe that the remaining unverified bit of . . . information—that Draper would have the heroin with him—was likewise true," and thus had probable cause to arrest him.  *Id.*

Similarly, in *United States v. Gagnon*, an individual under arrest for narcotics trafficking gave information to law enforcement about an impending drug deal with the defendant. Specifically, the informant told agents that he had planned to meet the defendant at a particular spot on the highway, at a particular time, and the trailer the defendant would be towing would have Lanfort written on the side and would be empty.  *See* 373 F.3d at 238.  The Second Circuit noted that "[a]lthough a criminal informer may be less reliable than an innocent bystander, . . . and corroboration of innocent behavior may be less dispositive than corroboration of criminal activity, . . . [the informant's] information was corroborated by the Officers in all material

respects, and, considering the totality of the circumstances, his entire account may be credited." *Id.* Accordingly, the court held, the tip, as corroborated, supported a finding of probable cause.

The same logic applies here:  Because CC-1 was proven right about certain facts, all of which were independently corroborated—the time and place of the meeting, the car Martinez would be driving—it was reasonable for the DEA agents to conclude that CC-1 was likely right about other facts involving the same events, including the claim that Martinez was coming to the meeting place to deliver narcotics.  *See Canfield*, 212 F.3d at 720 (corroboration of "innocent details" means that "there is a higher probability the incriminating facts are true"); *accord Gates*, 462 F.3d at 244.  Thus, CC-1's tip was sufficiently corroborated to support a finding of probable cause to arrest Martinez.  Martinez's motion to suppress the physical evidence seized from his car following that arrest is, therefore, denied.

### III.    Motion to Suppress the Post-Arrest Statements

Martinez moves to suppress the statements he made to DEA agents following his arrest on the ground that he was not fully advised of his *Miranda* rights before questioning.  As to this point, the parties sharply dispute the facts.  Martinez asserted in his affidavit in support of a suppression hearing that agents told him "in a raised voice and in an excited manner [he] could have a lawyer" but that they did not tell him that he had the right "to talk to a lawyer before [he] was asked any questions"; "to have a lawyer with [him] during the questioning"; or to have a lawyer "appointed for [him] before any questioning" if he could not afford a lawyer.  Martinez Aff. ¶ 5.  Martinez further asserted that the agents failed to ask him whether he understood his rights, and that the agents did not ask him to sign a document memorializing his rights waiver. *Id.* ¶¶ 6–7.

14

The Government, for its part, asserts that the agents read Martinez his rights from a standard DEA-13 form, and that Martinez thereupon indicated that he understood his rights. Gov. Br. 2, 9.  On this basis, the Government argues, Martinez's *Miranda* rights were fully respected.  The Government does not dispute that the agents did not have Martinez sign a formal rights waiver, but notes that no such signed document is legally required.

On a motion to suppress, the government bears the burden of proving the propriety of law enforcement conduct by a preponderance of the evidence.  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

### A.      Findings of Fact

The facts found by the Court are based on the evidence adduced at the suppression hearing.  This evidence consisted of the testimony of three witnesses: the DEA agents who interrogated Martinez following his arrest on May 15, 2013 (DEA Special Agents Sean Argyros and Matthew Ramarge) and Martinez.[4]

The government first called Special Agent Argyros.  He testified that after Martinez was transported to 205th Street and Paul Avenue, at or around 10:30 p.m., he read Martinez his rights.  Special Agent Argyros testified that he read those rights from a Form DEA-13 card, a printed advice-of-rights card that sets forth the *Miranda* rights.  *See* Government's Exhibit 1.  He testified that after advising Martinez of his rights, he asked Martinez whether he understood what he had just been read, and that Martinez indicated that he understood.  Special Agent Argyros could not recall whether Martinez had indicated his assent verbally or non-verbally (through body language), but was confident that Martinez did communicate that he understood his rights.

---

[4] The defense also called Martinez's girlfriend, Wendy Arias, to testify at the hearing.  Her testimony related to a visit that she stated one of the DEA agents had made later the night of the arrest to the home that she shares with Martinez.  The Court has determined that her testimony is not relevant to the issue at hand.  The Court accordingly does not address it here.

Special Agent Argyros also testified that, after being read his rights, Martinez stated, in essence, that there were pills in the car, and that the car belonged to his father.

In his testimony, Special Agent Argyros specifically stated that, consistent with his regular practice, he had read Martinez each of the four individual rights printed on the DEA-13 card, to wit, "You have the right to remain silent."; "Anything you say can be used against you in court."; "You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning."; "If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."  He acknowledged, however, that he did not read Martinez the phrase that precedes those rights as they appear on the DEA form ("Before we ask you any questions, you must understand:"), or the phrase that follows ("Are you willing to answer some questions?").  Special Agent Argyros testified that he omitted the latter two phrases because, at the moment the rights were read, he and the other agents, who were focusing on the search of Martinez's vehicle, did not intend to interrogate Martinez; the reading of the *Miranda* rights was just a precaution.  On cross-examination, Special Agent Argyros admitted that he had initially reported to the AUSAs handling this matter that Martinez had been read his rights at the site of the initial arrest, 199th Street and the Grand Concourse, rather than at the second location, 205th Street and Paul Avenue.  Special Agent Argyros testified that he later refreshed his memory, and now recalled reading Martinez his rights at 205th Street and Paul Avenue.

The Government then called Special Agent Ramarge.  He testified, consistent with Special Agent Argyros's testimony, that he had been standing next to Special Agent Argyros when Special Agent Argyros read Martinez his rights.  Special Agent Ramarge testified that he recalls Special Agent Argyros reading to Martinez from his DEA–13 card, that Special Agent

16

Argyros read Martinez each of his rights as printed on the card, that Special Agent Argyros asked Martinez if he understood his rights, and that Martinez responded verbally that he understood.  Special Agent Ramarge did not, however, recall the exact words Martinez used to communicate his understanding.

The defense then called Martinez.  He testified that the agents had stated "something" to him about a lawyer, but did not otherwise advise him of his *Miranda* rights.  Martinez further testified that the agents asked him if he understood his rights, but that he did not respond so as to indicate his understanding.  On cross-examination, Martinez stumbled.  The Government showed Martinez the sworn declaration submitted in support of his motion.  Martinez stated that he had not made the statements contained therein, despite the fact that the declaration culminated in his signature.

After careful consideration, the Court credits the testimony of Special Agents Argyros and Ramarge.  Having observed Special Agent Argyros in court and listened to his testimony, the Court considers reliable his testimony that he read Martinez his rights from the DEA-13 card, that he asked Martinez explicitly if he understood his rights, and that Martinez indicated that he had.  To be sure, Special Agent Argyros's recollection of the events surrounding the questioning of Martinez was, at points, inexact.  For one, Special Agent Argyros initially failed to recall the location at which he read Martinez his rights.  And most notably, the Court would have benefitted from clear testimony as to the means by which Martinez conveyed his understanding of his *Miranda* rights.  Had the events of the night of May 15, 2013, been memorialized contemporaneously in suitable detail, this shortcoming could presumably have been avoided.  However, the Court is persuaded that these inexactitudes do not bespeak a lack of truthtelling.  In so concluding, the Court relies on its close observation of Special Agent Argyros as he testified,

and on the fact that Special Agent Ramarge, whose testimony the Court also credited, corroborated the testimony of Special Agent Argyros, and indeed included a clear statement that Martinez had verbally stated that he understood the rights he had been read.  The Court also found the agents' testimony to contain various hallmarks of credibility, including the acknowledgment that Special Agent Argyros had not read Martinez the prefatory and concluding lines on the DEA form card—had the agents invented an account of reading Martinez his rights, they presumably would have stated that they had read Martinez the entire card verbatim.  The Court has thus determined that neither (1) Special Agent Argyros's initial failure to recall where the reading of the *Miranda* rights took place, nor (2) the presence of minor inconsistencies between the agents' testimony, signifies that the agents were not credible as to the two critical points at hand:  whether Martinez was read his *Miranda* rights and whether he indicated that he understood them.  *See United States v. Pena*, No. 89 Cr. 410 (SWK), 1990 WL 64591, at *3 ("discrepancies concerning collateral matters do not render [Agent's] testimony inherently incredible").

Martinez's testimony did not assist his cause.  On the contrary, the Court found his testimony internally inconsistent.  Whether a product of nervousness or lack of comprehension, the shifting nature of his testimony, and his repudiation of his prior sworn declaration, deprived his overall testimony of reliability.  In addition, two aspects of Martinez's testimony indirectly corroborated the agents' assertions.  First, Martinez admitted that the agents at least mentioned a lawyer to him.  Although Martinez perhaps may not recall or did not absorb the surrounding words by the agents at the time, that statement is consistent with the agents' shared testimony that Special Agent Argyros read Martinez his rights from the Form DEA-13.  Second, Martinez testified at the suppression hearing that the officers had asked him if he understood his rights—a

statement that contradicted his pre-hearing declaration, *see* Martinez Aff. ¶¶ 6– 7.  The agents'
on-scene query to him whether he understood his rights is hard to understand except as a
statement following a recitation to Martinez of those rights.

**B.    Discussion**

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), statements made to law enforcement in
a custodial interrogation are inadmissible unless the suspect was apprised of his Fifth
Amendment rights and then knowingly and voluntarily chose to waive those rights.  *United
States v. Oehne*, 698 F.2d 119, 122 (2d Cir. 2012).  A valid waiver has two distinct dimensions:
the waiver must be knowing, meaning that the defendant understood the nature of his *Miranda*
rights and the consequences of waiving those rights; and voluntary, meaning that it was the
product of free and deliberate choice rather than coercion.  *Berghuis v. Thompkins*, 560 U.S. 370,
382-83 (2010); *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the burden
of establishing by a preponderance of the evidence that a waiver was both knowing and
voluntary.  *Berghuis*, 560 U.S. at 383.

In light of the Court's factual findings that Martinez was read his rights and then
indicated that he understood those rights, the government has met its burden of proving a valid
waiver.  Considering the totality of the circumstances, Martinez had the "requisite level of
comprehension" of the nature of his rights and the consequences of relinquishing those rights to
make a knowing waiver.  *Moran*, 475 U.S. at 421; *see Berghuis*, 560 U.S. at 387-88 ("The
*Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings,
understands them, and has an opportunity to invoke the rights before giving any answers or

admissions.").[5] That Special Agent Argyros omitted the ancillary lines on the Form DEA-13 card is of no moment; those phrases do not go to the heart of the *Miranda* rights, and thus do not bear on Martinez's understanding of those rights. Martinez's motion to suppress his post-arrest statements is denied.

### CONCLUSION

For the foregoing reasons, the motion to suppress the physical evidence seized from defendant's car and defendant's post-arrest statements is denied. The Clerk of Court is directed to terminate the motion pending at docket number 12.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: January 16, 2014
       New York, New York

---

[5] The voluntariness of Martinez's waiver is not at issue. Nor is there any claim that Martinez lacked the capacity or the English-language skills to understand the rights read to him. The Court notes that Martinez testified at the suppression hearing in English. Although the Court found the substance of his testimony problematic, he readily demonstrated competency and fluency in English.